FILED

99 SEP 28 PM 3:31

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED

SEP 28 1999

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| CAROLYN CHANDLER, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 96-B-1719-NW |
| | } | |
| SLATTON-QUICK COMPANY, INC., | } | |
| d/b/a WLAY AM 1450 FM 105; | } | |
| D. MITCHELL SELF | } | |
| BROADCASTING, INC.; and | } | |
| JOHN SLATTON, individually; | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Currently before the court are defendant D. Mitchell Self Broadcasting Company's ("Self Broadcasting") Motion for Summary Judgment and defendants John Slatton ("Slatton") and Slatton-Quick Company's ("Slatton-Quick") joint Motion for Summary Judgment.

Plaintiff Carolyn Chandler ("Chandler") brought this suit alleging violations of her rights under the antiretaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 215(a)(3).[1/] Chandler also alleges state law claims of breach of contract and intentional interference with business or contractual relations. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that Self Broadcasting's motion is due to be granted and Slatton and Slatton-Quick's joint motion is due to be granted.

---

[1/] The EPA is an amendment of the FLSA. Therefore, EPA complainants are protected by the antiretaliation provisions of the FLSA. See 29 U.S.C. §§ 206(d), 215(a)(3).

## I. FACTUAL BACKGROUND

For over 35 years, defendant Slatton-Quick operated the WLAY radio station in Muscle Shoals, Alabama. Slatton Aff. ¶ 2. Defendant Slatton has been a stockholder of Slatton-Quick since 1959, at least a majority shareholder since 1977, and president of Slatton-Quick since 1990. *Id.* From 1970 to 1995, plaintiff Chandler served as a sales representative for WLAY. Chandler Dep. at 8-9. Chandler sold advertisement air time, prospected for new clients, prepared advertisements for broadcast, and collected payments on accounts. *Id.*

In 1993 and 1994, Chandler filed two separate lawsuits — which were later consolidated — against Slatton-Quick in the United States District Court for the Northern District of Alabama. *Id.* at 12-13, 25-27, Ex. 1. She claimed that Slatton-Quick violated her rights under Title VII and the EPA because a male sales representative was paid at a higher salary level and received better professional opportunities. *See id.* at 13-20.

Sometime after May 1994, Slatton-Quick began negotiations with Self Broadcasting for the sale of Slatton-Quick assets, including WLAY, to Self Broadcasting. Slatton Aff. ¶ 5. James Michael Self ("Self" or "Michael Self")[2] is the president and sole stockholder of defendant Self Broadcasting and the son of D. Mitchell Self ("Mitch Self"), a former president and stockholder of Slatton-Quick. Self Dep. at 5, 14; Slatton Aff. ¶ 4. Michael Self also had two terms of employment with WLAY, first as a janitor from 1972 to 1979 and later as a salesperson from the early 1980's to 1990. Self Dep. at 13-17. According to Self, he has known Chandler "ever since I can remember." *Id.* at 15. Chandler asserts that up to a year before the WLAY sale, Self had offered her a sales representative position at Shoals 97, another radio station owned by Self. Chandler Dep. at 32-39. Chandler apparently declined the offer, but she claims that Self had

---

[2] In this Memorandum Opinion, "Self" or "Michael Self" will refer to James Michael Self and "D. Mitchell Self" or "Mitch Self" will refer to D. Mitchell Self.

maintained the offer even when Chandler informed him about her lawsuit against Slatton-Quick. *Id.* at 39-40. She believes that she may have asked him to testify in her case and that he had agreed to do so. *Id.* at 40-41. Self does not recall making an offer of employment to Chandler. Self Dep. at 46-47. He denies that he agreed to testify and stated "I know I wouldn't testify against Mr. Slatton." *Id.* at 48-49.

On April 5, 1995, Self Broadcasting and Slatton-Quick signed a contract for the sale of Slatton-Quick's assets. Slatton Aff. ¶ 5; Slatton Dep. at Ex. 1 (Asset Sales Agreement). Because the Federal Communications Commission had to approve the transfer of station license, the sale was not finalized and Self Broadcasting could not assume control of WLAY until June 1995. Slatton Aff. ¶ 6; Chandler at Ex. 5. Slatton called a staff meeting in April 1995 and informed his employees of the pending ownership change. Chandler Dep. at 30, Ex. 5. Chandler recalls Self addressing the staff and telling them that he would not make any changes and that "everybody there had a job as long as they wanted one." *Id.* at 32. Mark Allen Pyle ("Pyle"), the WLAY station manager, also remembers Self telling the WLAY staff that they were a "winning team" and that he "was going to keep the team intact." Pyle Dep. at 20. Chandler alleges that Self personally assured her of job security during an individual meeting on the same day. Chandler Dep. at 32-33. Self denies saying that he would not break up the WLAY team and further denies promising any job security to Chandler. Self Dep. at 50-52, 57-60.

On May 8, 1995, Slatton-Quick and Chandler submitted their lawsuit to court-sanctioned mediation which ultimately resulted in the Settlement Agreement, Release, and Accord and Satisfaction ("Settlement Agreement"). Slatton Aff. ¶ 4; Chandler Dep. at 23-30, Ex. 1 (Settlement Agreement). During mediation, Chandler alleged that D. Mitchell Self had sexually harassed her. Chandler Dep. at 53; Slatton Dep at 47-48. The two lawsuits did not involve any

sexual harassment claims. Chandler Dep. at 53. Slatton attributes his willingness to settle the lawsuits in part to Chandler's comments about Mitch Self, his former business partner. Slatton Dep. at 47-49; Slatton Aff. ¶ 4. Although Mitch Self had died in 1990, Slatton maintains that he did not want the allegations concerning Mitch Self to be publicized. Slatton Dep. at 48. Slatton characterizes his relationship with Mitch Self as "we've been like brothers almost." *Id.* at 47. Slatton admits that he disclosed Chandler's comments to Jack Chism ("Chism"), a certified public accountant, on the day of the mediation. *Id.* at 47-49. Chism is not an employee of Slatton-Quick, but he has served as its accountant for over thirty-five years and Slatton describes him as "almost like a partner." *Id.* at 49-51. Slatton alleges that he had called Chism during the mediation in order to make financial arrangements for the Settlement Agreement. *Id.* at 47-49.

The Settlement Agreement disposed of the lawsuits by providing a cash sum for Chandler and releasing Slatton-Quick from liability without admitting any wrongdoing. Chandler Dep. at Ex. 1. The parties agreed to keep the terms and conditions of the Settlement Agreement confidential and to "respond to any inquiry concerning the terms of settlement as follows: 'The Matter has been resolved.'" *Id.* This confidentiality agreement placed the following duties on Slatton-Quick:

> SLATTON-QUICK, INC., its stockholders, directors, officers, employees, agents, successors and assigns, do hereby covenant and agree that it or they shall not reveal the terms or conditions of this settlement to any person or entitle [sic] other than . . . any accountant or attorney, or spouse of the sole stockholder, Mrs. John Slatton, or corporate officers as needed to do business. SLATTON-QUICK, INC. shall advise any person who is given this knowledge of this CONFIDENTIALITY AGREEMENT and require that they refrain from revealing the terms and conditions of this settlement to any other person or entity, except as required by a court of law or other person or entity with legal authority to discover the terms and conditions of this settlement.

*Id.*

During mediation, Chandler expressed concerns about her future employment. Chandler Dep. at 43. She allegedly called Self, at least once without success, on the day of mediation. *Id.* at 44. Self recalls receiving a phone message that Chandler had called but claims to have called Slatton before returning Chandler's. Self Dep. at 56-57. Self maintains that he called Slatton first to find out why Chandler was calling. *Id.* According to Slatton, Self called and told Slatton that Chandler "had called and said that she wanted to know if she was going to be fired." Slatton Dep. at 35-36. Self and Slatton agree that Slatton told Self that Chandler wanted a guarantee of employment with WLAY after Self Broadcasting's acquisition. *Id.*; Self. Dep. at 57. Chandler asserts that when she finally reached Self, Self assured her again that she "had a job [at WLAY] as long as you want one." Chandler Dep. at 45-46. In any event, the Settlement Agreement did not include any guarantees of job security and contained the following:

> CAROLYN CHANDLER acknowledges that she was made aware at the time of negotiation of the terms of the settlement that [Slatton-Quick] had entered into a contract to sell the assets of its business operated as WLAY Radio and that CAROLYN CHANDLER will not be an employee of [Slatton-Quick] upon said sale, which may occur as early as May, 1995.

*Id.* at Ex. 1. Following the Settlement Agreement, Chandler did not perceive any changes in her work conditions until Self Broadcasting assumed control of WLAY. *Id.* at 51-52.

Self Broadcasting assumed operation of WLAY on June 1, 1995. Slatton Aff. ¶ 6. On June 2, 1995, Chandler's employment with Slatton-Quick ended when all employees received a termination notice. *Id.*; Chandler Dep. at 80, Ex. 5 (termination notice). Most WLAY employees were rehired by Self Broadcasting; Self identified only four WLAY employees, including Chandler, that were not rehired. According to Self, Terry Slatton, John Slatton's son, was not rehired because he had not applied. Self Dep. at 44-45. Self claims that Sherry Medford, a deejay, and Gary Murdock, a deejay and sales representative, were also not rehired

because "their work habits were terrible" and they were rumored to be "involved romantically or physically." *Id.* at 42-44.

In deciding which former Slatton-Quick employees to rehire, Self claims that he relied completely on the advice of station manager Pyle and sales manager Dave Morrow ("Morrow"), who were both rehired by Self Broadcasting. *Id.* at 26-31. In turn, Pyle allegedly "relied a great deal" upon Morrow's recommendation with respect to Chandler. Pyle Dep. at 16, 31. Self, Morrow and Pyle all agree that Morrow's recommendation not to rehire Chandler was based primarily on her sales performance and collection of accounts sold. *Id.* at 18, 31; Self Dep. at 26-33, 38-39; Morrow Aff. ¶¶ 2-4. Morrow notes that Chandler had finished last in sales among the full-time sales representatives and attributes her performance "over a period of years" to her lack of imagination in proposing ideas to customers, her reluctance to solicit sales from customers, and her reluctance to collect on sales. Morrow Aff. ¶ 2. Self, however, believes that Morrow's recommendation was only based on the last six or seven months of Chandler's twenty-five years of employment. Self Dep. at 32-33. Despite his criticisms of Chandler, Pyle concedes that Chandler demonstrated several, positive, professional attributes; he agrees that she was very "loyal," "punctual," "a team player," "pretty diligent and pretty responsible" in performing her duties, "well-liked in the community" and "presented a good image for the station." Pyle Dep. at 14-16. Pyle describes Chandler as a "mother figure" and adds that "she was seen as someone who had been a part of WLAY and a part of the institution for quite some time." *Id.* at 16.

Slatton claims that neither he nor Slatton-Quick had any input as to which former employees would be rehired by Self Broadcasting, although he admits that during his negotiations with Self, he "recommended [to Self] that all the employees be retained because I felt like we had a winning team." Slatton Aff. ¶¶ 7, 8; Slatton Dep. at 17. Pyle and Self

corroborate Slatton's claim of non-involvement in Self Broadcasting's personnel decisions. Pyle Dep. at 18-19; Self Dep. at 74. Nevertheless, Self admits that Chism had told Self about Chandler's comments concerning Self's father, Mitch Self. Self Dep. at 61-63. This disclosure occurred a few days before Self Broadcasting took over WLAY. *Id.* at 61. Self acknowledges that neither the lawsuit nor the Settlement Agreement would have or actually had any impact on Self Broadcasting because Self Broadcasting was not assuming any of Slatton-Quick's liabilities. *Id.* at 63-64.

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at

255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A. RETALIATION CLAIMS

In Counts I and II of her Complaint, Chandler claims that Slatton-Quick and Self Broadcasting unlawfully retaliated against her for bringing a discrimination charge against Slatton-Quick in 1993.[3] *See* Pl.'s Compl. ¶¶ 12-19. Title VII and the FLSA prohibit employers from discriminating against employees for having opposed discriminatory employment practices. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 215(a)(3).[4] "To recover for retaliation, a plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Assocs.*

---

[3] In Count I, Chandler also alleges violations of her right "to be free of gender-based discrimination with respect to discipline, discharge and other terms, conditions and privileges of employment." Pl.'s Compl. ¶ 13. Chandler apparently concedes that she was not the victim of gender-based discrimination as she has not made any effort to argue such a claim. *See* Pl.'s Br. Opp. Slatton-Quick's Mot. [hereinafter Pl.'s SQC Br.]; Pl.'s Br. Opp. Self Broadcasting's Mot. [hereinafter Pl.'s DMSB Br.]. Consequently, the court is of the opinion that the defendants' motions concerning Chandler's gender discrimination claims are due to be granted.

[4] Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a). The FLSA makes it unlawful for an employer to "discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3)

*Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).

The familiar framework of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), governs retaliation claims. *See Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992). The plaintiff's prima facie burden may be satisfied by showing: (1) the plaintiff engaged in statutorily protected activity; (2) the plaintiff suffered an adverse employment action; and (3) some causal relationship existed between the protected activity and the adverse employment action. *Meeks*, 15 F.3d at 1021 (citing *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); and *Tipton*, 872 F.2d at 1494)). If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *See Meeks*, 15 F.3d at 1021. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for a retaliation. *Id.* At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful retaliatory motive. *See id*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

### 1. *Claims Against Self Broadcasting*

Chandler claims that Self Broadcasting unlawfully retaliated by not rehiring her when it assumed operation of WLAY. Self Broadcasting's failure to rehire certainly constitutes an adverse employment action.[5] But given the evidence put forward by the parties and drawing all

---

[5] Unlike Slatton-Quick, Self Broadcasting does not dispute whether it is an "employer" within the meaning of 42 U.S.C. § 2000e-3(a). *See* Self Broadcasting's Br. at 6-8 [hereinafter DMSB's Br.].

reasonable inferences in Chandler's favor, a fact finder could not reasonably conclude that Chandler was engaged in statutorily protected activities that are causally connected (i.e., not completely unrelated) to Self Broadcasting's actions.

Chandler does not have a viable retaliation claim under the FLSA. In conjunction with the EPA, the FLSA prohibits employers from retaliating against employees for opposing gender-based pay disparities. *See* 20 U.S.C. §§ 206(d), 215(a)(3). During her mediation with Slatton-Quick, Chandler alleged that she had been sexually harassed by D. Mitchell Self, former president of Slatton-Quick and father of Self Broadcasting president Michael Self. Chandler Dep. at 52-53, 119-20. Chandler's retaliation claim against Self Broadcasting rests solely on the theory that Self Broadcasting refused to rehire her in retaliation for these comments pertaining to D. Mitchell Self. Pl.'s DMSB Br. at 9, 11-12, 16; Chandler Dep. at 52-54. Even if Self Broadcasting failed to rehire her because of these comments, Chandler would not have a valid FLSA claim against Self Broadcasting because Self Broadcasting would not have discriminated against her due to any EPA-related activities. Chandler has never argued that Self Broadcasting discriminated against her for opposing pay differences. *See* Pl.'s DMSB Br. at 9, 11-12, 16; Chandler Dep. at 52-54. Therefore, a reasonable fact finder could only conclude that Chandler's activities fell outside the FLSA's protection.

Chandler's Title VII claim follows a similar analysis. Title VII protects employees from sexual harassment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986). Opposition to sexual harassment, even if not in the form of a formal complaint, is protected from retaliation by employers. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992) (internal complaint to company management); *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 896 (3d Cir. 1993) (letter to Congressman complaining of racism).

Unlike the present case, however, the efforts undertaken by the plaintiffs in each of these two cases were good faith efforts at protesting or opposing allegedly unlawful employment practices. *See* 957 F.2d at 65 ("internal complaint . . . protest[ed] the sexually harassing actions of [plaintiff's] supervisor"); 982 F.2d at 896 (letter "articulated [plaintiff]'s opposition to racial discrimination"). In the present case, Chandler made her comments during the negotiation of unrelated claims. Her comments cannot be reasonably viewed as complaints, protests or any other form of opposition to Slatton-Quick employment practices, especially because the alleged harasser, D. Mitchell Self, had passed away several years prior to Chandler's comments. Given the context of Chandler's comments, a reasonable fact finder could not conclude that Title VII protects such comments. Therefore, plaintiff fails to establish an essential prong of her Title VII retaliation claim and defendant Self is entitled to judgment on this claim as a matter of law.

### 2. *Claims Against Slatton-Quick*

As its first argument, Slatton-Quick contends that it cannot be liable for retaliation because it is not an "employer" within the meaning of Title VII's antiretaliation provision. Slatton-Quick's Br. at 12-13 [hereinafter SQC's Br.]. Slatton-Quick asserts that, as a matter of law, it had "ceased to be an 'employer' of Plaintiff when all employees of [Slatton-Quick] were terminated . . . ." SQC's Br. at 12-13. This argument is not supported by current law.

In an unanimous opinion, the Supreme Court has held that a plaintiff could sue his former employer for retaliation because the term "employees," as used in 42 U.S.C. § 2000e-3(a), includes *former* employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). In *Robinson*, the plaintiff had brought a retaliation suit because the defendant, his former employer, allegedly provided a negative reference for a prospective employer. *Id.* The court reasoned that the exclusion of former employees "would effectively vitiate much of the protection afforded by [42 U.S.C. § 2000e-3(a)]." *Id.* Furthermore, the court recognized the consistency of such an

-11-

interpretation with the "primary purpose" of antiretaliation provisions: "Maintaining unfettered access to statutory remedial mechanisms." *Id.* (citing, *inter alia*, *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292-293 (1960), which interpreted the FLSA). Given the Supreme Court's clear statement of law, Title VII's antiretaliation provision could apply to Slatton-Quick in the present case.

Slatton-Quick also argues that case law "require[s] that Plaintiff prove that the 'immediate cause' or 'motivating factor' for [Self Broadcasting]'s failure to hire her as an employee was retaliation for her prior EEOC or [FLSA] activities." SQC's Br. at 8.[6/] By characterizing the "immediate cause" test as an "additional requirement," Slatton-Quick misstates the law of retaliation. Slatton-Quick's argument for an "immediate cause" test actually states nothing more than the plaintiff's "ultimate burden" of proving that adverse employment action was the result of the employer's intentional discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Thus, requiring Chandler to satisfy the "immediate cause" test would amount to requiring direct evidence of discrimination. The law of this circuit does not require such a showing. *See Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985) (per curiam), *cert. denied*, 474 U.S. 981 (1985).[7/]

---

[6/] This "argument" is contained in the "Plaintiff's Burden of Proof" section of Slatton-Quick's brief, separate from the section containing the argument in favor of summary judgment, and is only an exposition of law with no reference to supporting facts.

[7/] Slatton-Quick's argument for application of an"immediate cause" test could not possibly pertain to the "causal relationship" element of Chandler's prima facie case. First, Slatton-Quick refers to the test as an "additional requirement" after listing the basic prima facie elements. *See* SQC's Br. at 8-9. More importantly, the Eleventh Circuit has defined the causal relationship element as follows:

> We do not construe "causal link" in the [prima facie case] to be the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the

Nevertheless, for the reasons stated with regard to defendant Self Broadcasting, given the context of Chandler's comments a reasonable fact finder could not conclude that plaintiff engaged in activity protected by Title VII at the time she made her comments about Mitchell Self during mediation. Because plaintiff has failed to establish a prima facie case of retaliation, Slatton-Quick's Motion for Summary Judgment on this claim is due to be granted.

### B.  STATE LAW CLAIMS

#### 1.  *Breach of Mediation Agreement and Order*

Count III of Chandler's Complaint claims that Slatton, as an agent of Slatton-Quick, "breached the confidentiality of the settlement agreement reached in *Chandler v. Slatton-Quick Company, Inc.*" by disclosing statements made by Chandler during mediation. Pl.'s Compl. ¶ 21. Under Alabama law, a breach of contract is proven by establishing: "(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Southern Med. Health Sys. v. Vaughn*, 669 So. 2d 98 (Ala. 1995). Slatton and Slatton-Quick advance several arguments in support of their motion regarding this claim.

Slatton and Slatton-Quick first argue that the confidentiality provision of the Settlement Agreement only pertains to "terms and conditions" of the Settlement Agreement and does not cover any discussions during mediation. SQC's Br. at 13-16. The confidentiality provision of the Settlement Agreement follows:

---

defendant. Rather, we construe the "causal link" element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

*Simmons*, 757 F.2d at 1189; *accord Meeks*, 15 F.3d at 1021. Slatton-Quick's argument for an "immediate cause" test is obviously inconsistent with this definition of "causal link."

-13-

> Carolyn Chandler hereby covenants and agrees that she shall not reveal the **terms or conditions of this settlement** to any person or entity other than her current husband, an accountant, or any attorney. ....... Slatton-Quick, Inc., its stockholders, directors, officers, employees, agents, successors and assigns, do hereby covenant and agree that it or they **shall not reveal the terms or conditions of this settlement** to any person or entity other than as is necessary to comply with the requirements of the Federal Communication Commission or other governmental entity, the Internal Revenue Service, the State of Alabama, or any accountant or attorney, or spouse of the sole stockholder, Mrs. John Slatton, or corporate officers as needed to do business. Slatton-Quick, Inc. shall advise any person who is given this knowledge of this CONFIDENTIALITY AGREEMENT and require that they refrain from revealing the terms and conditions of this settlement to any other person or entity, except as required by a court of law or other person or entity with legal authority to discover the terms and conditions of this settlement. ....

Chandler Dep., Exhibit 1. (emphasis added).

As argued by defendant Slatton, the court must then look to the terms and conditions of the Settlement Agreement in order to determine whether plaintiff has put forth sufficient facts on which a reasonable jury could conclude that defendant breached the confidentiality provisions of the Settlement Agreement. The "terms and conditions" of the Settlement Agreement are:

> Paragraph 1–Payment of $62,500 to plaintiff; full release and settlement of plaintiff's legal actions; dismissal of plaintiff's legal actions; and indemnification of SQCI as to any future claim or suit by plaintiff's husband.
>
> Paragraph 2–Acknowledgment by Carolyn Chandler that SQCI does not admit liability by paying money to her.
>
> Paragraph 3–Provisions concerning whether SQCI will file a W-2 tax form or 1099 tax form with the IRS or State of Alabama.
>
> Paragraph 4–Provisions about the payment of mediator fees.
>
> Paragraph 5–Confidentiality provision.
>
> Paragraph 6–Statement that settlement is an accord and satisfaction.

>Paragraph 7–Each party shall bear its own costs.
>
>Paragraph 8–Acknowledgment by Carolyn Chandler that she is aware that assets of SQCI may be sold in the future and she would no longer be an employee of SQCI.
>
>Paragraph 9–Acknowledgment of review of document by the parties and acknowledgment of execution of the document.

*Id.*

Plaintiff complains about John Slatton's statement to his outside accountant (Chism) about remarks made during mediation by Chandler to the effect that Mitch Self, a deceased former officer and stockholder of Slatton-Quick, had sexually harassed her.[8] No reasonable jury could conclude that these statements were part of the "terms and conditions" of the Settlement Agreement.[9] Therefore, defendants Slatton and Slatton-Quick are entitled to judgment as a matter of law on this claim.

Plaintiff also argues in her brief that there was a binding contract between plaintiff and Slatton-Quick pursuant to the Alternative Dispute Resolution Plan of the Northern District of Alabama.[10] Since December 1, 1993, mediation of cases before the United States District Court for the Northern District of Alabama is governed by the court's ALTERNATIVE DISPUTE

---

[8] Slatton offered a valid reason why Chism was entitled to learn about Chandler's statements during mediation. Slatton was explaining to his long-time accountant a motivating factor in his desire to settle the case.

[9] Additionally, Slatton and Slatton-Quick argue that no breach occurred because Slatton's alleged disclosure occurred before the Settlement Agreement was finalized and that Slatton "took precautions to avoid revealing the 'terms and conditions' of the settlement." SQC's Br. at 16-17. Slatton and Slatton-Quick also assert that Jack Chism, the company's accountant who later disclosed the comments to Michael Self, "was not acting within the line and scope of his employment" at the time he disclosed Chandler's statements to Self. SQC's Br. at 17. Because the court has found that no reasonable jury could conclude that Chandler's remarks about Mitch Self were part of the "terms and conditions" of the Settlement Agreement, it is unnecessary to reach these arguments.

[10] This claim is not contained in plaintiff's Complaint.

RESOLUTION PLAN ("ADR PLAN"). N.D. ALA. R. 16.1(c). The ADR PLAN contains the following confidentiality clause:

> The entire mediation process is confidential and by entering into mediation the parties mutually covenant with one another to preserve confidentiality on the basis established in this Plan. The parties and the mediator may not disclose information regarding the process, except the terms of settlement, to the court or to third persons unless all parties agree.

N.D. ALA. R. App. at 10 (ADR PLAN).

While a violation of the confidentiality provisions of this court's plan might form the basis of sanctions by the court, it cannot form the basis of a breach of contract claim. Therefore, defendants Slatton and Slatton-Quick are entitled to judgment as a matter of law on this claim.

### 2. *Intentional Interference with Economic Relations*

Finally, in Count IV of her Complaint, Chandler avers that Slatton and Slatton-Quick "intentionally interfered with the employment relationship" between herself and Self Broadcasting. Pl.'s Compl. ¶¶ 23-25. Alabama law requires the following elements for a claim of intentional interference with economic relations: "(1) The existence of a contract or business relation; (2) Defendant's knowledge of the contract or business relation; (3) Intentional interference by the defendant with the contract or business relation; (4) Absence of justification for the defendant's interference; and (5) Damage to the plaintiff as a result of defendant's interference." *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597 (Ala. 1986) (paragraph structure altered; footnotes omitted).[11] The Alabama Supreme Court set forth these elements in *Gross* to "announce a new rule . . . broad enough to encompass both interference with business relations and interference with contractual relations, and which also

---

[11] Absence of justification is only relevant if a defendant raises justification as an affirmative defense. *Id.* at 597 n.3. Slatton-Quick and Slatton have not plead this defense.

expands the cause of action for interference with contractual relations so as to incorporate the majority rule." *Id.* at 597.

While the Alabama Supreme Court has followed the *Gross* elements exclusively in most cases, it has stated an additional "fraud, force or coercion" requirement in others. *Compare Sevier Ins. Agency, Inc., v. Willis Corroon Corp. of Birmingham*, 711 So. 2d 995, 1001 (Ala. 1998) (no additional requirement); *Spring Hill Lighting & Supply Co. v. Square D Co.*, 662 So. 2d 1141, 1150-51 (Ala. 1995)) (no additional requirement); *with Barber v. Business Prods. Ctr., Inc.*, 677 So. 2d 223, 227 (Ala. 1996) (requiring "fraud, force or coercion and citing *Joe Cooper & Assocs. v. Central Life Assurance Co.*, 614 So. 2d 982, 986 (Ala. 1992)). Secondary sources do not support a requirement of "fraud, force or coercion." For example, the RESTATEMENT (SECOND) TORTS contains the following comment on the means of interference:

> There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. The interference is often by inducement. The inducement may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other. *Thus it may be a simple request or persuasion exerting only moral pressure.* Or it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made. Or it may be a threat by the actor of physical or economic harm to the third person or to persons in whose welfare he is interested. Or it may be the promise of a benefit to the third person if he will refrain from dealing with the other.

RESTATEMENT (SECOND) TORTS § 766 cmt. k (1979) (emphasis added). *See also* APJI Civil No. 10.35 (1993 & 1997 Supp.) (no additional requirement of "force, fraud or coercion"); MICHAEL L. ROBERTS & GREGORY S. CUSIMANO, ALABAMA TORT LAW §§ 26.0, 26.2 (2d ed. 1996 & 1997 Supp.) (no mention of additional requirement) [hereinafter ROBERTS & CUSIMANO, ALABAMA TORT LAW]. Considering the inconsistency of the decisions from the Alabama Supreme Court

and the persuasive authority of the secondary sources, the court finds it unnecessary for Chandler to produce evidence of fraud, force or coercion to survive summary judgment.[12]

In their main argument, Slatton and Slatton-Quick assert that "there is no evidence of an intentional or malicious act by John Slatton or Slatton-Quick." SQC's Br. at 19. This argument actually raises two separate legal issues. First, Slatton and Slatton-Quick apparently believe that malice is a required element of Chandler's intentional interference claim. In reality, Alabama law does not require a plaintiff to show that a defendant acted with malice. *See Creel v. Davis*, 544 So. 2d 145, 147-48 (Ala. 1989) (noting that such an element would redefine the tort as "malicious interference" instead of "intentional interference"). In *Creel*, the Alabama Supreme Court reasoned that such a requirement would "place the burden of proving lack of justification on the plaintiff." *Id.* at 148. As noted above, the plaintiff does not bear responsibility for proving lack of justification; the defendant must raise justification as an affirmative defense. *Id.*; *Gross*, 494 So. 2d at 597 n.3. Thus, Chandler's failure to put forth evidence of malice does not warrant summary judgment of her intentional interference with economic relations claim.

Slatton and Slatton-Quick also argue that no evidence supports a finding that either Slatton or Slatton-Quick had acted intentionally. Under Chandler's theory of the case, Slatton and Slatton-Quick, through their agent Jack Chism, intentionally interfered with Chandler and Self Broadcasting's economic relations. Pl.'s SQC Br. at 19-20. To establish "intentional interference" per *Gross*, a plaintiff must produce evidence of affirmative or active interference. *See Bear Creek Enters., Inc. v. Warrior & Gulf Navigation Co.*, 529 So. 2d 959, 960-61 (Ala. 1988) (holding refusal to deal not intentional interference); *McCluney v. Zap Prof'l Photography*,

---

[12] In fact, Slatton-Quick and Slatton actually cite an Eleventh Circuit case where the court only required the elements listed in *Gross*. *See* SQC's Br. at 18 (citing *Chrysler Capital Corp. v. Lavender*, 934 F.2d 290 (11th Cir. 1991)).

*Inc.*, 663 So. 2d 922, 926 (Ala. 1995) (holding threatened refusal to deal not intentional interference). *See also* ROBERTS & CUSIMANO, ALABAMA TORT LAW § 26.2. Additionally, the alleged acts of interference must be intentional. *See Gilbert v. Congress Life Ins. Co.*, 646 So. 2d 592, 594 (Ala. 1994) (holding no intentional interference where, *inter alia*, no evidence of any alleged interference being intentional).

During the mediation conference, Slatton made a statement to his outside accountant (Chism) in confidence. There is no evidence on which a reasonable jury could conclude that Slatton ever intended this comment to be communicated to anyone at Self Broadcasting. In fact, Slatton did not learn that Chism had passed Ms. Chandler's comments on to Mike Self until the date of the depositions in this case. There are no facts that could support a reasonable inference that Slatton and Slatton-Quick intended to interfere with Chandler's and Self Broadcasting's economic or business relations. Therefore, the court finds that Chandler did not meet her burden of showing a genuine issue of material fact exists with respect to her intentional interference of economic relations claim.

## IV. CONCLUSION

The court concludes that Slatton-Quick and Slatton's joint Motion for Summary Judgment and Self Broadcasting's Motion for Summary Judgment are due to be granted. All claims against Slatton-Quick, Slatton, and Self Broadcasting will be dismissed with prejudice. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 28th day of September, 1999.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge